**UNITED STATES of America,
Appellant,**

v.

**Joseph A. TRAVISANO,
Defendant-Appellee.**

**No. 138, Docket 83–1159.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 1, 1983.
Decided Dec. 22, 1983.

Jeremiah F. Donovan, Asst. U.S. Atty., D. Conn., New Haven, Conn. (Alan H. Nevas, U.S. Atty., D. Conn., New Haven, Conn., of counsel), for appellant.

Richard A. Reeve, Asst. Federal Public Defender, D. Conn., New Haven, Conn. (Thomas G. Dennis, Federal Public Defender, D. Conn., New Haven, Conn., of counsel), for defendant-appellee.

Before KEARSE, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

Upon application of the local police following a shooting and robbery in August 1982, a Superior Court Judge in Connecticut issued a search warrant for a West Haven residence. The ensuing search failed to unearth the instrumentalities of that crime, but did turn up an unregistered gun which later resulted in a federal indictment being lodged against defendant Joseph Travisano. The indictment charged Travisano with possession of an unregistered short barrelled

Winchester shotgun in violation of 26 U.S.C. §§ 5861 and 5871 (Count One), and, as a previously convicted felon, with possession of a firearm that had affected commerce in violation of 18 U.S.C.App. § 1202(a) (Count Two). In granting defendant's motion to dismiss both counts of the indictment, the district court set forth its reasons in an opinion, *United States v. Travisano,* 560 F.Supp. 627 (D.Conn.1983).

While we agree with the trial court's conclusion that Count Two should have been dismissed, since the issue raised by the government is one of first impression we set forth our reasons for affirming on that count in some detail later in this opinion. We reverse and remand for trial on Count One because in our view probable cause did exist for the issuance of the search warrant.

I

The facts in this kind of case are critical. Here, while concededly close, they are not in dispute. We recite them chronologically.

At 2:13 on Monday afternoon August 9, 1982, two messengers employed by the AAA Motor Club in Hamden, Connecticut were robbed in the AAA parking lot. During the course of the robbery one of the messengers was shot in the face and seriously wounded. The robbers stole an AAA Motor Club flight bag which had three American National Bank bags containing over $35,000 in cash and $45,000 in checks payable to the AAA. Eyewitnesses saw two men flee from the scene of the shooting, run south to the vicinity of a Howard Johnson parking lot and jump into an older-make white Cadillac in which a third male was waiting. The Cadillac carried a vanity plate in front, identified by one witness as "Baby Joe," and the first two letters of the Connecticut license plate mounted on the rear were noted as "YE." The news media reported this incident and broadcast the fact that the police were searching for a white Cadillac bearing a vanity plate.

The next morning—Tuesday, August 10 —the West Haven Police, responding to a Connecticut police teletype message sent to give notice of the robbery, advised that one of their officers had observed a vehicle, which matched the one described, on Elm Street in West Haven. At 10:30 a.m. the Hamden police established surveillance of this vehicle which was parked in a driveway at 371 Elm Street and bore Connecticut license plate number YE1034. The police learned that this 1970 white Cadillac was registered to Marie Travisano, a resident at the Elm Street address. West Haven police told the Hamden officers that Marie Travisano's son, Mark, frequently used the Cadillac and that in the past it had carried a vanity plate which the West Haven officers recollected as bearing the legend "Baby John." On the morning of August 10, during the course of the Hamden police surveillance, the automobile was being operated by a white female. It was immediately observed that the identifying vanity plate had been removed. Randy Borruso, one of the eyewitnesses to the shooting, was shown the vehicle while it was parked on Elm Street that morning and he identified it as the white Cadillac he had seen the day before speeding from the scene of the shooting and robbery.

The surveillance was terminated at noon. Within the next hour or so, two Hamden police detectives with combined experience of 39 years as police officers presented the above information in affidavit form to Judge Harrigan, a Superior Court Judge of the State of Connecticut. He signed the search warrant authorizing the Hamden officers to search the white Cadillac and the residence at 371 Elm Street for the AAA Motor Club flight bag, the three American National Bank bags, a .38 caliber handgun, a vanity plate with the legend "Baby John", numerous checks payable to the AAA Motor Club and a large amount of paper currency. The warrant was executed at 2:30 p.m. that same afternoon at the Elm Street address. None of the enumerated items of evidence were discovered, but during the search the police found an unregistered sawed-off shotgun (that was the subject of the motion to suppress) in the front foyer closet of the Elm Street residence.

In suppressing the gun, the illegal possession of which is the gravamen of Count One, the district court found "only a minimal connection between the instrumentalities of the robbery and the residence, namely, the fact that the car was located in front of the house and that the police somehow knew that the owner's white male son was a frequent driver of the vehicle." 560 F.Supp. at 629. We disagree. In our view of the law of probable cause, there were sufficient facts before the State Court Judge for him to sign the search warrant.

## II

Countless are the cases that undertake to define probable cause. The recitation of what we believe are the applicable rules to apply in this case will be brief. Searches under the authority of an arbitrarily obtained warrant like the flagrant one in *Wilkes v. Wood,* 19 Howell's State Trials 1153, 98 Eng.Rep. 489 (K.B.1763), are what prompted the concerns of the framers of the Bill of Rights. In *Wilkes,* the Secretary of State authorized a general warrant in a search for the author of a pamphlet critical of the King. The warrant did not name any person who could be searched or describe the items to be seized. Under its authority, 49 persons were quickly arrested on suspicion and from them it was learned that John Wilkes might be the author of the offending publication. Armed with that intelligence, the warrant which had been issued three days earlier was immediately executed at Wilkes' home. All his private papers, including his will, were seized by the messengers dispatched for that purpose, after they had forced his cabinet drawers. The wrong done Wilkes was righted after a stirring trial by a jury award of a thousand pounds damages. But, a lesson had been learned from the use to which this general warrant had been put. If a public official could arbitrarily order the home of a member of Parliament searched and his papers and personal effects seized, what then of the rights of everyday citizens? Plainly, the answer was that to safeguard individual rights of privacy would require the imposition of restraints upon those officials granted the power to issue warrants.

With the lesson grasped, the Fourth Amendment was drafted to provide that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. *See* Loewy, *The Fourth Amendment as a Device for Protecting the Innocent,* 81 Mich.L.Rev. 1229, 1237 (1983) ("Loewy"). In the American colonies prior to the Revolution, customs officers used writs of assistance to enter and search buildings for smuggled goods. It was against their issuance that James Otis, representing 63 Boston merchants, protested. His oratory on the occasion was such that one commentator ascribed to John Adams the belief that Otis' speech marked the birth of American Independence. 1 W. LaFave, Search and Seizure, § 1.1, at p. 4 (1978) ("LaFave"). At any rate, the use of these infamous writs became so sharply etched in the minds of those who later attended the Constitutional Convention of 1787 as to make the need for a provision dealing with searches a focal point in the ratification debates. James Madison later undertook the drafting of a suitable clause in the Bill of Rights and, in substance, his words comprise the first phrase of the Fourth Amendment: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. *See* W. LaFave, *supra* § 1.1, at 5.

The qualifying language of the Fourth Amendment which prohibits unreasonable searches and warrants issued without probable cause plainly implies that there is no constitutional prohibition against a reasonable search, nor one against a properly issued warrant. The reason is that the government's interest in obtaining evidence of crime is so compelling that without the means to accomplish it, people would never be secure in their persons, houses or papers. *See, e.g., Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d

782 (1967). The common thread that laces together the two phrases of the Fourth Amendment—one which reflects the history and experience that brought the Amendment into being—is the constraint it exerts on the exercise of arbitrary power in both the issuance of a warrant and the conduct of a search or seizure. Thus, while the Amendment provides for the needs of the community in obtaining evidence of crime, its built-in restraints also safeguard the right of individual privacy—one of the bulwarks of liberty. *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).

### III

■ In order to assure that neither one of these policies is emphasized at the expense of the other, a neutral and detached magistrate is inserted between the government's agents and the object of the search. It is the magistrate's duty to hold the balance steady between the protection of individual privacy on the one hand and the public need to recover evidence of wrongdoing on the other. The magistrate should first satisfy himself as to the adequacy and reliability of the facts set forth in the application before him. *See United States v. Beltempo,* 675 F.2d 472, 477 (2d Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982). It is from these facts and any reasonable inferences to be derived from them that he determines whether probable cause to issue a warrant is or is not present. To establish probable cause to search a residence, two factual showings are necessary—first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence. *See United States v. Harris,* 403 U.S. 573, 584, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971). *Cf. Brinegar v. United States,* 338 U.S. 160, 173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879 (1949). In this case it is conceded that a crime was committed, so our focus will turn shortly to the second required showing.

■ Once a magistrate has made a determination on the issue of probable cause, our analysis shifts to the function of the reviewing court. Its after-the-fact examination of the papers is not to be *de novo* review. *Illinois v. Gates,* —— U.S. ——, ——, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983). It should start with the proposition that the magistrate's finding of probable cause is entitled to substantial deference. *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *Jones v. United States,* 362 U.S. 257, 270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960); *United States v. Zucco,* 694 F.2d 44, 46 (2d Cir. 1982). In fact, a search based upon a magistrate's determination will be upheld by a reviewing court on less persuasive evidence than would have justified a police officer acting on his own. *Aguilar v. Texas,* 378 U.S. at 111, 84 S.Ct. at 1512. Further, the magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of this warrant. *United States v. Jackstadt,* 617 F.2d 12, 13 (2d Cir.) (per curiam), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); *United States v. Follette,* 379 F.2d 846, 848 (2d Cir.1967); *United States v. Freeman,* 358 F.2d 459, 462 (2d Cir.), *cert. denied,* 385 U.S. 882, 87 S.Ct. 168, 17 L.Ed.2d 109 (1966); *United States v. Ramirez,* 279 F.2d 712, 716 (2d Cir.), *cert. denied,* 364 U.S. 850, 81 S.Ct. 95, 5 L.Ed.2d 74 (1960). This is particularly true in close cases where doubts should be resolved in favor of upholding the warrant. *United States v. Zucco,* 694 F.2d at 46; *United States v. Jackstadt,* 617 F.2d at 14; *Accord United States v. Lewis,* 392 F.2d 377, 379 (2d Cir.), *cert. denied,* 393 U.S. 891, 89 S.Ct. 212, 21 L.Ed.2d 170 (1968).

■ Having viewed the papers in light of these precepts and having accorded great deference to the magistrate's finding of probable cause, it remains for the reviewing court to decide whether the magistrate performed his neutral and detached function on the facts before him, and did not merely serve as a rubber stamp for conclusions drawn by the police. *Aguilar v. Texas,* 378 U.S. at 111, 84 S.Ct. at 1512. In deciding

whether the magistrate has done his part in a neutral manner, the reviewing court must have in mind that probable cause has been stated to be a "practical, nontechnical conception . . . [and] in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* —— U.S. at ——, 103 S.Ct. at 2328; *see also Brinegar v. United States,* 338 U.S. at 176, 69 S.Ct. at 1311; *United States v. Fisher,* 702 F.2d 372, 375 (2d Cir. 1983). In considering the quantum of certainty required, it is only a probability, and not a prima facie showing of criminal activity, that is the standard of probable cause. *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964). Plainly, the standard of probable cause cannot imply "more probable than not" under circumstances such as those here where many locations were available to the guilty parties to secrete the stolen goods. *See* 1 W. LaFave, *supra* § 3.2, at pp. 486–93. Nor must the standard used by a reviewing court be so stringent, technical or grudging as to discourage the use of search warrants. *United States v. Ventresca,* 380 U.S. at 108, 85 S.Ct. at 745; *United States v. Freeman,* 358 F.2d at 461. Because the application for a search warrant, as this case illustrates, is often drafted by the police "in the midst and haste of a criminal investigation," the papers should be read practically and in a commonsense fashion. *United States v. Ventresca,* 380 U.S. at 108, 85 S.Ct. at 745. In sum, the applicable standard to be derived from these principles is that there be a fair probability that the premises will yield the objects specified in the search warrant. *See Illinois v. Gates,* —— U.S. at ——, 103 S.Ct. at 2336.

## IV

We turn now to the application of these standards to the second required showing, i.e., that there was probable cause to believe that evidence of the robbery and shooting, and the missing vanity plate was to be found at the Elm Street residence.

■ The robbery occurred on the afternoon of August 9, and by the morning of August 10, the police had pinpointed their surveillance to the residence at 371 Elm. They knew that the owner of the vehicle parked in front of the house lived there, and that the vehicle was known to carry a white vanity plate reading "Baby John." Considering the value of the items which were stolen and the short time involved, the magistrate could reasonably infer that the robbers had time to remove and secrete the items and desired to secure these items in a safe area such as a residence. In view of the fact that the media reported that the police were searching for a white Cadillac with a vanity plate, its removal—like flight from the scene of the crime—is some indication of a guilty person's concern at being identified. It is hardly a coincidence that someone connected with the previous day's crime had removed the plate; rather, it is a strong inference. A reasonable conclusion would be that finding the plate would also lead to the gun and stolen goods. The fact that the getaway car was located in front of its owner's house militates against any finding that it had been stolen, except in the highly unlikely event that the fleeing robbers courteously returned the car to its owner after their hurried departure from the Howard Johnson parking lot. It is much more probable that there was some nexus between the car and those residing in the house at 371 Elm Street. At the very least, the owner had either recently loaned the Cadillac or acquiesced in someone else's use of it. In either event, there was an articulable connection between the residence and the Cadillac used in the robbery so as to remove the Elm Street house and its occupants from the category of innocent householders whose privacy the Fourth Amendment protects. Loewy, *supra,* at 1248 *et seq.*

Under the applicable tests, we conclude that the state court magistrate had sufficient underlying facts before him so as to make it a fair probability that the items sought would be found in the Elm Street residence. Thus, the issuance of the search

warrant did not violate the Fourth Amendment. The order of the district court, insofar as it suppresses the gun, is therefore reversed and the case remanded for trial on Count One of the indictment.

## V

We turn finally to the district court's dismissal of Count Two of the indictment that charged Travisano, as a previously convicted felon, with possession of a firearm which had affected commerce in violation of 18 U.S.C.App. § 1202(a). On appeal, as in the court below, the government has conceded that it cannot establish that the firearm travelled in interstate commerce after its manufacture. It argues instead that it should be permitted to satisfy the commerce requirement by showing that the process of manufacture of the gun affected commerce.

Section 1202 subjects any convicted felon "who receives, possesses or transports in commerce or affecting commerce, . . . any firearm" to a $10,000 fine or two years in prison or both. The commerce power has been broadly construed in other contexts since Chief Justice Marshall's decision in *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). The power of Congress to reach even local activities if they exert a substantial economic impact on interstate commerce has been held to be constitutionally within the proper scope of federal regulation, despite the fact that the effect on interstate commerce may be only indirect. *See Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942). The same rationale that sustains Congress' power when it acts in the field of civil regulation has also been employed in analysis of the constitutionality of criminal statutes. Thus, when Congress passed a statute making "loan-sharking" activities a federal offense, the Supreme Court sustained a conviction under the statute and noted that extortionate credit transactions may be purely intrastate and still, in the judgment of Congress, affect interstate commerce. *See Perez v. United States,* 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686

(1971). The findings of Congress, the court continued, are quite adequate to show a "tie-in between local loan sharks and interstate crime." *Id.* at 155, 91 S.Ct. at 1362.

The present statute presents an entirely different picture. This statute, concededly not a model of clarity, also has raised such substantial questions about its constitutionality—were it to be read as proscribing mere possession of a firearm—that the Supreme Court was prompted to conclude "that Congress has not 'plainly and unmistakably', *United States v. Gradwell,* 243 U.S. 476, 485, 37 S.Ct. 407, 410, 61 L.Ed. 857 (1917), made it a federal crime for a convicted felon simply to possess a gun absent some demonstrated nexus with interstate commerce." *United States v. Bass,* 404 U.S. 336, 348–49, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971). In interpreting this statute, it must be remembered that some nexus with commerce must be shown, although that need not be "any more than the minimal nexus that the firearm have been, at some time, in interstate commerce." *Scarborough v. United States,* 431 U.S. 563, 575, 97 S.Ct. 1963, 1969, 52 L.Ed.2d 582 (1977). ·

While conceding that it cannot prove that the shotgun travelled in interstate commerce, the government asks us to remand the case for a hearing for it to demonstrate a nexus between the crime and interstate commerce, *i.e.,* for it to show that the process of the Winchester shotgun's manufacture affected commerce. It contends that since no limit has been established for what constitutes the minimal nexus requirement, citing *United States v. Montoya,* 676 F.2d 428, 433–34 (10th Cir.), *cert. denied,* 459 U.S. 856, 103 S.Ct. 124, 74 L.Ed.2d 108 (1982) and *United States v. Perkins,* 633 F.2d 856, 859 (8th Cir.1981), we are free to rule that manufacture affecting commerce is a sufficient nexus.

There is no doubt that Congress sought by § 1202 to punish broadly the possession of firearms by convicted felons. What is not so clear—and makes this issue one of first impression—is whether the minimal nexus set forth in *Scarborough* establishes a

limit, so that any proof, short of evidence that the firearm in question itself travelled in interstate commerce, is insufficient. Plainly, the manufacture of any firearm has some impact on interstate commerce. Nothing in the legislative history suggests that the government could satisfy the terms of the statute and obtain convictions under it simply by showing that the manufacturing process affected commerce. This history, fully set forth in *Scarborough,* makes clear that the crime referred to involved possession of a "weapon" or "gun" which was equated with "firearm." 431 U.S. at 572–74, 97 S.Ct. at 1967–69.

Section 1202(c)(3) provides that:

"firearm" means any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; or any firearm muffler or firearm silencer; or any destructive device. Such term shall include any handgun, rifle, or shotgun.

Arguably, under such definition, parts are considered a "firearm", *e.g.,* the use of the word "frame" and "receiver" in the definition suggests it. Nonetheless, the primary thrust of the definition of the word "firearm" appears to include weapons "designed to expel a projectile", or an attachment to such weapon, like a silencer, or "any destructive device." Moreover, if the definition has an ambiguity it simply emphasizes the Supreme Court's finding that this statute is not a model of clarity. *Scarborough v. United States,* 431 U.S. at 567, 97 S.Ct. at 1965. There is not sufficient substance to the government's argument to persuade us that the process of manufacture will satisfy the statute's requirements and sustain a criminal conviction. Finally, were we to adopt the government's view, the commerce requirement set forth in the statute would have no meaning since any convicted felon with a gun would be guilty of a federal crime without proof of nexus. We do not believe that this was Congress' purpose. Accordingly, we affirm the dismissal by the district court of Count Two.

KEARSE, Circuit Judge, dissenting in part:

With due respect for the majority's view, I dissent from so much of the judgment as reverses the district court's order suppressing the gun found in Joseph Travisano's home pursuant to the search warrant issued by the state court. I agree with the district court that the affidavit submitted in support of the request for a warrant to search both the car and the house did not present sufficient facts to show probable cause to search the house.

The central question in a review of whether a warrant has been issued on probable cause is whether the issuing official had a "'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). There is no question here that probable cause existed to issue a warrant for the search of the car. In my view, however, there was lacking a substantial basis for concluding that evidence relating to the robbery would be uncovered in a search of the house.

The pertinent facts presented to the state court were as follows. A robbery occurred in Hamden, Conn., at 2:13 on the afternoon of August 9. The next morning, before 10:30 a.m., the white Cadillac that had been used by the robbers was seen in nearby West Haven, Conn., outside the home of its owner, Marie Travisano. Mrs. Travisano was not one of the robbers, all of whom were males. Her son Mark was known as a frequent operator of her car. The "news media" had indicated that the car used in the robbery was a white Cadillac with a front vanity plate. When, on the morning of August 10, police spotted Marie Travisano's car, the car's vanity plate had been removed.

On these facts, I agree with many of the statements in the majority opinion; I simply do not believe they add up to probable cause to search the house. For example, the majority opinion states that it is "prob-

able that there was some nexus between the car and those residing at 371 Elm Street," *ante* at 346, and that "there was an articulable connection between the residence and the Cadillac used in the robbery," *id.* Indeed there was an articulable nexus or connection: the woman who owned the Cadillac lived at that residence. But no basis was presented for showing that the owner of the residence was a robber or that a robber had that residence. And, the majority opinion states, "the owner had either recently loaned the Cadillac or acquiesced in someone else's use of it." *Id.* This is probably true—although I have heard of sons who used their parents' cars without permission—and I would not second-guess a magistrate's inference that Mrs. Travisano had allowed Mark to use the car on August 9. But there are so many factual gaps that a conclusion that evidence of the robbery would likely be found in the house must involve speculation. The affidavit made no attempt to establish probable cause to believe that Mark was one of the robbers. The robbers were described only as three white males; no information was given as to their ages, heights, weights, etc. Further, the affidavit did not state or suggest that Mark lived at his mother's house. Nor did the affidavit suggest that any other male lived at Mrs. Travisano's house. Neither the fact that Mark may have gone frequently to his mother's house in order to pick up and return her car, nor the inference that he returned the car to her house on August 9 or 10, seems to me to justify an inference that Mark—*if* it should be inferred that he was one of the robbers—likely chose her house in which to hide evidence of the crime.

Further, the time and distances involved do not create any inference that a robber went directly or quickly from the scene of the crime to the residence of Marie Travisano. There was apparently an interval of some 20 hours between the robbery and the sighting of the car at Mrs. Travisano's house. West Haven, where Mrs. Travisano lived, is perhaps 10 miles from Hamden, where the robbery occurred. In the 20-hour span, the robbers could have done just about anything with the stolen items.

Given the gaps in the affidavit upon which the search warrant was issued, it appears that the rule adopted by the majority today is as follows: if (a) a mother frequently allows her son to use her car, and (b) the car is used by a male of the same race in a nearby robbery one afternoon, and (c) the car is next seen on the following morning in front of the owner's house (with its vanity plate missing), the owner has been "remove[d] ... from the category of innocent householders whose privacy the Fourth Amendment protects." Majority Opinion, *ante* at 346. I do not believe that probable cause—or the Fourth Amendment—means so little.