UNITED STATES of America

v.

Kenneth McGRIFF, a/k/a
"Supreme", Defendant.

No. 87 CR 750.

United States District Court,
E.D. New York.

Feb. 24, 1988.

Andrew J. Maloney, U.S. Atty., Brooklyn, N.Y. by Kirby A. Heller, Asst. U.S. Atty., for U.S.

Todtman, Hoffman, Epstein, Young, Goldstein, Tunick & Pollok, P.C., New York

City, for defendant; by Susan C. Wolfe, Michael Gold.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Pursuant to Federal Rule of Criminal Procedure 12, defendant moves to suppress the fruits of a search of his residence, 166–66 231st Street, Queens, New York, conducted pursuant to a warrant issued upon an allegedly inadequate showing of probable cause. Defendant also filed three other pretrial motions:

1. The indictment must be dismissed because he is being vindictively prosecuted;

2. The indictment must be dismissed because it violates a plea agreement between the defendant and the New York City Special Narcotics Prosecutor in a previous action; and

3. In evaluating the warrant's sufficiency, State law must govern this action.

The latter three motions rest on this action's unique procedural history. The search warrant's validity has been litigated already in two separate actions in New York State Courts in Queens and Manhattan. Each action arose out of separate searches conducted pursuant to the warrant at issue here. Defendant McGriff was not a named defendant in the Queens action. However, that Court action resulted in a ruling on the admissibility of evidence seized at 155–47 116th Avenue, Queens. By a decision dated January 27, 1986, Judge Alan Beldock of the Queens Criminal Court found the telephonic search warrant affidavit lacking in probable cause, and suppressed all evidence seized at 155–47 116th Avenue (App. 61–65).[1]

Charges were also filed based on evidence seized at another Queens address.

The action against defendant McGriff, and others not named in the Queens or this federal action, based on evidence seized at McGriff's residence, 116–66 231st Street, Queens, was brought in New York County by the citywide Special Narcotics Prosecutor. Defendant McGriff's motion to preclude litigation of the search warrant's validity based on Judge Beldock's ruling in the Queens action was denied by a decision dated April 3, 1986, by Mr. Justice McLaughlin of the Supreme Court, New York County (App. 154–57).[2] However, defendant's motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), was granted. *Id.* After conducting the hearing and questioning the confidential informant in a sealed proceeding pursuant to *People v. Darden*, 34 N.Y.2d 177, 356 N.Y.S.2d 582, 313 N.E.2d 49 (1984), Mr. Justice McLaughlin denied defendant's suppression motion by an opinion dated April 16, 1986 (App. 278–82). On May 19, 1986, defendant McGriff pled guilty to count twelve of the New York County indictment, criminal possession of a controlled substance in the first degree.[3] Denial of defendant's suppression motion was preserved for appellate review.

Upon appeal to the Appellate Division, First Department, defendant's suppression motion was granted. *People v. McGriff*, 130 A.D.2d 141, 518 N.Y.S.2d 795 (First Dept.1987). In dicta, the Appellate Division advised that its ruling "would obtain even if we were to apply the less stringent 'totality of the circumstances' test propounded by the United States Supreme

---

1. References to "App." are to sworn testimony before New York State Courts or decisions of such courts included in the Appendix for Defendant–Appellant, *People v. McGriff*, 130 A.D.2d 141, 518 N.Y.S.2d 795 (First Dept.1987). Defendant filed this record in this action on November 23, 1987, in support of his suppression motion. References to "T." are to the transcript of the hearing conducted before this Court on January 22, 1988.

2. In a portion of a later opinion joined by three of the five-Justice panel, the Appellate Division

overruled Mr. Justice McLaughlin's refusal to grant defendant's motion to estop the prosecution from litigating the warrant's validity in the New York County action. *McGriff*, 130 A.D.2d at 150–53, 518 N.Y.S.2d at 801–02.

3. Count twelve of the New York County Superseding Indictment charged criminal possession of a controlled substance in the first degree (App. 77). However, at the pleading count twelve was apparently reduced to criminal possession in the second degree (App. 317–19).

Court in *Illinois v. Gates.*" *Id.* at 149, 518 N.Y.S.2d at 800. Indictment by a federal grand jury then followed.

■■■ Despite the unusually roundabout fashion in which this action reached this Court, defendant's latter three motions relying on the prior New York State actions lack merit. First, the doctrine of prosecutorial vindictiveness does not apply to prosecutions brought by different sovereigns, absent a showing that a State prosecution was a stalking horse for a subsequent federal investigation. *See United States v. Russotti*, 717 F.2d 27, 31 (2d Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); *United States v. Ng*, 699 F.2d 63, 69 (2d Cir.1983). Defendant has not proffered sufficient grounds for conducting a hearing on the relationship, if any, between the 1985 State investigation and the 1987 federal investigation. Second, since defendant has not alleged that federal officials participated in any plea negotiations in the New York County action, this Court is not bound by the Special Narcotics Counsel's agreement. *See United States v. Sackinger*, 704 F.2d 29, 32 (2d Cir.1983). Third, in determining the sufficiency of the search warrant application, federal law must be applied. *See United States v. Pforzheimer*, 826 F.2d 200, 202–04 (2d Cir.1987).

Defendant's substantive suppression motion requires more detailed analysis. The confidential informant, whose reliability, credibility, and basis of knowledge as revealed to the issuing Magistrate are under attack by this motion, was no stranger in 1985 to the policeman who obtained the warrant.

For several months prior to September 1985, Officer Myron Cherry of the 113th Precinct Robbery Unit, not the affiant here, had been receiving information from an unregistered confidential informant (App. 225, 233–34). Although he was Officer Cherry's informant, Officer Cherry regularly passed along tips provided by him to other policemen, including Sergeant Clyde Foster, affiant in this action (App. 227, 234; T. 6, 7, 17). Sergeant Foster also briefly met and spoke with the informant on at least a few occasions when the informant tried to reach Officer Cherry (T. 6). Sergeant Foster spoke with him often enough to recognize his voice over the telephone (T. 34). In an indication of the informant's reliability, in July of 1985 Officer Cherry told Sergeant Foster that "the informant had given the names of the individual responsible for firing the shot that caused the death at that location [145–15 Guy R. Brewer Boulevard] and an arrest had been made of the suspect" (T. 18, 19). *See also* T. 16–20.

Thus, Sergeant Foster's interest in utilizing the informant in narcotics investigations prior to September 10, 1985, although Cherry was the informant's officer, was threefold: first, the homicide witnessed by the informant occurred at an address that Sergeant Foster independently knew was a "free base" house and had been searched in the course of a separate narcotics investigation (App. 27). Second, the homicide at that address, 144–15 Guy R. Brewer Boulevard, was in some way connected to an alleged $80,000 cocaine and currency robbery at defendant's residence, 116–66 231st Street, Queens, during the week of July 4, 1985. *Id.* Third, Officer Cherry and in part Detective DeRosalia had vouched for the informant's reliability based on his information provided in the homicide investigation and they said that the informant would be an excellent source for the narcotics unit (T. 6, 16–20).

On September 10, 1985, Officer Cherry was told by his informant that "he believed that some people were being held . . . in a location somewhere on 115th Avenue and a [sic] 155th Street; 116th Avenue and 155th and that sometime later that evening there was suppose [sic] to be a delivery of some narcotics at 231st and 116th Avenue" (App. 59). Officer Cherry immediately relayed this information to Sergeant McKeon of the Narcotics Unit, who in turn relayed it to Sergeant Foster at about 6:15 P.M. (*id.*; T. 4). Sergeant Foster then spoke with Officer Cherry, who confirmed Sergeant McKeon's statements and added that his informant had provided this information (T. 5–6). Officer Cherry said his source would

be calling in again later in the evening, and Sergeant Foster told Officer Cherry that he would like to speak to the informant when he called (T. 7–8).

After speaking to Officer Cherry, Sergeant Foster returned to his office to determine how to respond to the alleged assault at 155–47 116th Avenue and the allegedly imminent drug transaction at 116–66 231st Street. Apparently in a commendable effort to confirm the tip through police surveillance, he dispatched units to both locations (T. 8). In addition, he called the Police Department's Legal Bureau which gave him the telephone number for the Queens Criminal Court and advised him to obtain a telephonic search warrant. *Id.* Evidently acting on the advice of counsel, Sergeant Foster then called the Court, learned that no judge was available and awaited a return call. *Id.*

While awaiting a return call, Sergeant Foster spoke with the informant who, as promised, called the precinct once again and confirmed with Sergeant Foster personally the information previously relayed through Officer Cherry (T. 9).[4] Sergeant Foster instructed the informant to make himself available to come to the stationhouse to provide, if necessary, further information to permit issuance of a search warrant (T. 10). The informant, quite reasonably fearing for his safety if he was seen by his companions in the stationhouse, was reluctant to comply (T. 9–10). As the informant had admitted that he would be participating in the drug cutting at 116–66 231st Street later that evening, Sergeant Foster might also have been sympathetic to his position.

Nonetheless, the informant called once again and arranged to be picked up on a streetcorner by Detective Larry Mikoleski, who knew the informant by sight and was driving an unmarked police van (App. 238–42; T. 11). Before Detective Mikoleski returned to the stationhouse, Judge Fisher of the Queens County Criminal Court returned Sergeant Foster's call (T. 11–13). *See* discussion *infra* for details of the telephonic search warrant affidavit.

Only at the very end of the colloquy with Judge Fisher did Sergeant Foster learn that the informant was inside a police van parked near the stationhouse (T. 12–13). Perhaps wishing to avoid bringing the informant into the stationhouse unless his presence was absolutely necessary, Sergeant Foster did not tell Judge Fisher that the informant was available (T. 13). Judge Fisher authorized search and arrest warrants for the first location, 155–47 116th Avenue, and a search warrant only for the second location, 116–66 231st Street.

Sergeant Foster saw the informant on his way out of the stationhouse to execute the warrant (T. 15). At the first location, 155–47 116th Avenue, seven people were arrested, and misdemeanor quantities of drugs as well as several rifles were found. *McGriff*, 518 N.Y.S.2d at 796. The search of defendant's residence, 116–66 231st Street, led to the arrest of defendant and four others, and the seizure of approximately eight pounds of drugs, eight handguns, and over $35,000 in cash. *Id.*

### The Franks Hearing

■ Pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), defendant has challenged Sergeant Foster's statements to Judge Fisher in the telephonic search warrant affidavit. As the Assistant United States Attorney consented to a *Franks* hearing to determine whether Sergeant Foster spoke with the

---

**4.** The confidential informant testified under oath in New York State Court in a sealed *Darden* hearing that he spoke to Sergeant Foster prior to Sergeant Foster's search warrant application to Judge Fisher (App. 278–82). Although this Court has not received an opportunity to review the transcript, Mr. Justice McLaughlin of the Supreme Court, New York County, heard and credited the informant's testimony. *Id.*

Sergeant Foster's testimony in other proceedings that he did not speak directly to the informant on the evening of September 10, 1985, prior to speaking to Judge Fisher does not negate this Court's finding that his testimony in federal court on January 22, 1988, was credible. Sergeant Foster has now spent more than eighteen years in the New York City Police Department, and by 1988 he had received an opportunity to review the complex events of September 10, 1985. He admitted on December 6, 1985, that "I'm not so sure what the situation was" (App. 30).

confidential informant on September 10, 1985, prior to speaking to Judge Fisher, no preliminary showing of intentional false-hood and materiality was required. *See Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676.

This Court's hearing showed that Sergeant Foster spoke to the unnamed informant on the evening of September 10, 1985, prior to the issuance of the search warrant. Sergeant Foster apparently misspoke while under oath as he stated to Judge Fisher that he had spoken to the informant at 6:15 P.M. Before this Court, he stated that he could not remember when he spoke to the informant, but that it was not at 6:15 P.M. However, the precise time at which Sergeant Foster spoke to the informant is irrelevant to the probable cause determination, so long as the conversation occurred on September 10, 1985, prior to Foster's colloquy with Judge Fisher.

Sergeant Foster also misspoke when he told Judge Fisher that he beeped the informant to acquire further information (T. 11–12); instead, Foster actually had sent another policeman to obtain the information from the informant, who was at that time near the stationhouse, so this misrepresentation was immaterial. Thus, no materially false information was provided by Sergeant Foster to Judge Fisher.

*The Search Warrant Affidavit*

■ This Court may not review the transcript of Sergeant Foster's telephonic search warrant affidavit *de novo* as a Magistrate's determination of probable cause should be paid great deference by reviewing courts. *See Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983) ("magistrate's finding of probable cause is entitled to substantial deference"). Judge Fisher's

finding of probable cause by itself is a substantial factor tending to uphold the warrant's validity. *Id.* In a close case, doubts should be resolved in favor of upholding a search warrant. *Id.*

In looking over Judge Fisher's shoulder, so to speak, and Monday morning quarterbacking his probable cause determination on September 10, 1985, this Court must determine whether he had a substantial basis for concluding that a search of defendant's residence would recover "any contraband, drugs, money, or guns" related to criminal activity. *See Gates,* 462 U.S. at 236, 103 S.Ct. at 2331; *see also Travisano,* 724 F.2d at 346 ("[t]here [must] be a fair probability that the premises will yield the objects specified in the search warrant"). Since the affidavit came in the midst of an ongoing and fast-breaking criminal investigation, this Court must take particular care to review the warrant in a common-sense fashion. *See Gates,* 462 U.S. at 230, 103 S.Ct. at 2328; *Travisano,* 724 F.2d at 346. The substantial basis test enables this Court to determine whether Judge Fisher "performed his neutral and detached function on the facts before him, and did not merely serve as a rubber stamp for conclusions drawn by the police." *Travisano,* 724 F.2d at 345.

■ Thus, if the totality of the circumstances surrounding the telephonic search warrant affidavit provided a substantial basis for believing that the evidence sought would be found in the defendant's residence, the warrant may not be disturbed. *See Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332.[5] Both the veracity and basis of knowledge of the unnamed informer must be weighed, along with other circumstances. *Id.* However, some statements in search warrant applications may not, with-

---

**5.** The fact that the contraband was unlikely to be found until the cutting operation began does not invalidate the warrant. Warrants anticipating the presence of evidence at a location are not *per se* improper. An anticipatory warrant is "based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specific place." 2 W. LaFave, *Search and Sei-*

*zure* § 3.7(c), at 94 (2d ed. 1987). "[I]t may be fairly said that as a general proposition the facts put forward to justify issuance of an anticipatory warrant are more likely to establish that probable cause will exist at the time of the search than the typical warrant based solely upon known prior location of the items to be seized at the place to be searched." *Id.* at 97.

out more, provide a Magistrate with a substantial basis for issuing a warrant:

> An officer's statement that "[a]ffiants have received reliable information from a credible person and do believe" that heroin is stored in a home, is ... inadequate. *Aguilar v. Texas*, 378 U.S. 108 [84 S.Ct. 1509, 12 L.Ed.2d 723] (1964).... [T]his is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause.

*Gates*, 462 U.S. at 239, 103 S.Ct. at 2333. In effect, the Magistrate in *Aguilar* acted as an impermissible rubber stamp instead of holding "the balance steady between the protection of individual privacy on the one hand and the public need to recover evidence of wrongdoing on the other." *Travisano*, 724 F.2d at 345.

██ Clearly, Judge Fisher's actions went far beyond that of a rubber stamp for Sergeant Foster's warrant application. On the night of Tuesday, September 10, 1985, he received telephonically the sworn testimony of Sergeant Foster, a member of the New York City Police Department at that time for more than sixteen years, setting forth information provided to him that very same evening by, as he described him, "a citizen who is known to the Department and whose [sic] [has been] reliable in the past, not a registered informant." The information he received included the following, in part:

*As To The First Location*, 155–47 116th Avenue

> Foster: ... [A]t 155–47 116 Avenue there is [sic] two male black individuals who have been abducted and seriously beaten and they are possibly near death.... This is the result of a drug transaction.
>
> Court: But he [the confidential informant] has provided information to you in the past?
>
> Foster: He has provided information in the past. The information has been known to be reliable.
>
> Court: ... [H]ow does he know?
>
> Foster: ... [H]e had left the location approximately 20 minutes prior to

[our] conversation.... Had seen the persons being held there....

> Court: And had witnessed the assault?
>
> Foster: Yes, sir.
>
> Court: ... [H]ad also seen drug paraphernalia and guns and money....?
>
> Foster: Yes.

*As To The Second Location*, 116–66 231st Street (Defendant's residence)

> Foster: The same individual, when I spoke to him, stated that he was in the company of three of the persons involved and at approx 2000 hours this date that they would be present at this address, 116–66 231 Street, for the purpose of cutting and distributing drugs.
>
> Court: ... [H]e related that information based on what he was told by those persons?
>
> Foster: ... The individual ... also expects to be present at the location at that time, and anticipates being arrested.

On the basis of virtually contemporaneous, eyewitness information relayed by the Sergeant under oath to Judge Fisher, warrants for both locations were issued.

At first blush, Sergeant Foster's bald assertion of his informant's trustworthiness might appear inadequate to support probable cause to search solely based on the tip. However, such assertions, even without additional facts, may have some probative value. *See United States v. Marbury*, 732 F.2d 390, 396–97 (5th Cir. 1984).

Furthermore, other circumstances, of which Judge Fisher was aware, buttressed the informant's reliability. Sergeant Foster's "citizen" or "unregistered informant" presented Sergeant Foster and in turn Judge Fisher with insider information as he had been an eyewitness to an abduction and a severe beating resulting from a drug transaction. Even under the restrictive *Aguilar–Spinelli* tests, a special showing of an actual eyewitness's credibility and reliability was unnecessary. *See United States v. Burke*, 517 F.2d 377, 380–81 n. 2 (2d Cir.1975); *see also United States v. Watts*, 540 F.2d 1093, 1097–98 (D.C.Cir. 1976).

 The informant also implicated himself and others involved with the assault in a drug cutting and distribution operation to be conducted at defendant's residence. If an informant confesses to participating in criminal activities subject to a search warrant, his trustworthiness need not be demonstrated to the issuing Magistrate. *See United States v. Lace,* 669 F.2d 46, 49 (2d Cir.1982) (citing Second Circuit cases). Even if a co-conspirator is in custody, with an enhanced incentive to cooperate, such admissions do not require detailed support as to their reliability in a search warrant affidavit. *See United States v. Dunloy,* 584 F.2d 6, 10 (2d Cir.1978); *United States v. Feola,* 651 F.Supp. 1068, 1093 (S.D.N.Y. 1987); *United States v. Iparraguirre,* 628 F.Supp. 831, 835 (E.D.N.Y.1986). In this action, as in *Lace,* the informant was still at large at the time he furnished the inculpatory information and had no particular incentive, such as pending charges, to assist investigators. The tip was also inherently reliable because the informant could have been prosecuted if his tip had been knowingly false. *See People v. Clark,* 103 Misc.2d 498, 503–04, 426 N.Y.S.2d 692 (N.Y.Sup.Ct., N.Y. County 1980); N.Y. Penal Law § 240.50 (McKinney 1980).

Since Sergeant Foster's informant was simultaneously an eyewitness to a recently completed or ongoing crime, a confessed participant in an imminent crime, and faced prosecution regardless of whether his tip was true or knowingly false, Sergeant Foster's seemingly conclusory assertion of his informant's trustworthiness supported his informant's credibility more than would appear at first glance. Once beyond the *Aguilar* threshold, a weakness in an informant's credibility and reliability can be compensated by other circumstances, including basis of knowledge. *See Gates,* 462 U.S. at 234, 103 S.Ct. at 2330 ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of wrongdoing, along with a

statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case."); *United States v. Laws,* 808 F.2d 92, 102 (D.C. Cir.1986) ("[A] fair indication of the informant's basis of knowledge may compensate for a less than conclusive demonstration of his credibility.").

 Sergeant Foster's informant's basis of knowledge could not have been much better. There is a substantial difference between his basis of knowledge, acquired as a co-participant in an ongoing criminal enterprise about to engage in its next very serious criminal act and the more usual basis of knowledge of an outsider passing along his observations of the activities of others. *Cf. Gates,* 462 U.S. 243–46, 103 S.Ct. at 2334–36. Both the Federal Rules of Evidence and substantive criminal law recognize the value of an accomplice's direct testimony. The hearsay rules, not binding on probable cause determinations, *see Jones v. United States,* 362 U.S. 257, 272, 80 S.Ct. 725, 736–37, 4 L.Ed.2d 697 (1960), require witnesses to testify from firsthand knowledge, absent specific exceptions. *See* Fed.R.Evid. 801, 802. As a matter of substantive law, the uncorroborated testimony of a co-conspirator, even one with a substantial criminal record, is sufficient if credited to constitute proof beyond a reasonable doubt, a standard far more stringent than the fair probability test applicable here. *See United States v. Phillips,* 426 F.2d 1069, 1071 (2d Cir.), *cert. denied,* 400 U.S. 843, 91 S.Ct. 86, 27 L.Ed. 2d 78 (1970).[6]

 Thus, based on Sergeant Foster's showing of the informant's trustworthiness and basis of knowledge, combined with the totality of the circumstances surrounding the search warrant affidavit, Judge Fisher had probable cause to issue a search warrant for defendant's residence.[7] However, even assuming that the affidavit was flawed, the good faith exception to the exclusionary rule bars suppression of the seized evidence. *See United States v.*

---

6. In citing *Phillips,* the Second Circuit has specifically noted that this substantive rule of criminal law assures that an accomplice's tip included in a search warrant affidavit is inherently

reliable. *United States v. Dunloy,* 584 F.2d 6, 10 n. 2 (2d Cir.1978).

7. Sergeant Foster possessed information at the time of the search warrant application strength-

*Leon,* 468 U.S. 897, 919–22, 104 S.Ct. 3405, 3418–20, 82 L.Ed.2d 677 (1984); *United States v. Fama,* 758 F.2d 834, 836–38 (2d Cir.1985). Sergeant Foster's belief in the warrant's validity was objectively reasonable under both the New York Court's application of the technical *Aguilar–Spinelli* standards and under the federal rule considering the totality of the circumstances. *See* discussion *supra* of warrant's validity. If the search warrant affidavit was sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause, Sergeant Foster was entitled to rely on it. *See Fama,* 758 F.2d at 838 (quoting *Gates*). In this context, this Court notes that Mr. Justice McLaughlin of the Supreme Court, New York County, applied New York's search and seizure doctrine and shared this Court's view that "a combination of factors shows that the informant was reliable" (App. 162).

There is no evidence that Judge Fisher was misled in issuing the warrant in accordance with information that Sergeant Foster knew or should have known was false. This Court's *Franks* hearing showed that Sergeant Foster misstated the time at which he spoke to the informant, and that he incorrectly asserted that he was beeping the informant when in fact another policeman was sent to obtain the necessary additional information. *See* discussion *supra* of *Franks* hearing. Neither of these statements, made under oath, were material to the probable cause determination. Sergeant Foster properly relied on a warrant which was granted after he knowingly misstated two irrelevant facts, a slip which is excusable considering the hectic preparations Sergeant Foster had to complete to execute the search on the evening of September 10, 1985. This affidavit does not contain a misstatement intended to deceive a Magistrate into granting a warrant based on information the affiant knows is false. *Cf. United States v. Thomas,* 489 F.2d 664, 669 (5th Cir.1973), *cert. denied,* 423 U.S. 844, 96 S.Ct. 79, 46 L.Ed.2d 64 (1975). The other inconsistencies and misstatements made by Sergeant Foster in the State Court hearings and noted in the *Franks* hearing before this Court do not relate to substantial matters and do not degrade Sergeant Foster's credibility or his good faith reliance on probable cause for the warrant.

Accordingly, defendant's pretrial motions must be, and the same hereby are, denied.

SO ORDERED.

---

ening his informant's reliability and credibility which he did not provide to Judge Fisher, perhaps because the searches were imminent and further delay might have cost lives. He knew that the informant had provided information in July, 1985, that led to an arrest in a homicide investigation. He also knew that the defendant's residence had long been suspected as a drug haven. *See* discussion *supra* of the reasons for Sergeant Foster's interest in the informant prior to September 10, 1985. The reputation of defendant's residence for drug dealing actually strengthened the informant's reliability as it confirmed the earlier complaint from another source (App. 27–29). *Cf. United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 2081, 29 L.Ed.2d 723 (1971) (policeman's knowledge of a suspect's reputation stated in warrant affidavit may be considered in assessing reliability) (opinion of Burger, C.J., announcing judgment for Court, joined by Black and Blackmun, JJ.).

However, the Supreme Court has so far barred lower courts evaluating warrants from considering information police possessed at the time they sought a warrant but which they could not, due to the circumstances, share with the issuing Magistrate. *See United States v. Leon,* 468 U.S. 897, 915, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984) (affidavit must provide substantial basis for probable cause determination); *Whiteley v. Warden,* 401 U.S. 560, 565 n. 8, 91 S.Ct. 1031, 1035, n. 8, 28 L.Ed.2d 306 (1971); *Aguilar v. Texas,* 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964); *see also United States v. Turner,* 558 F.2d 46, 51 (2d Cir.1977).

Since the issue in search warrant affidavit challenges after *Leon* is in part whether the police had an objectively reasonable belief that they had probable cause to search, not entirely as in the past whether the affidavit was technically correct, this rule may merit reconsideration. As in this action, the totality of the circumstances may indicate why the affidavit did not include all relevant information. On the facts here, had Sergeant Foster told or been able to tell all that he knew relevant to the informant's credibility, the warrant would have been valid beyond cavil.