**UNITED STATES of America, Plaintiff,**

v.

**Richard LOVE a/k/a "Ronnie," Defendant.**

**No. 90 Cr. 913 (DNE).**

United States District Court, S.D. New York.

Aug. 9, 1994.

Mary Jo White, U.S. Atty. for the S.D. of N.Y. (Deborah E. Landis, Asst. U.S. Atty., of counsel), for U.S.

Hoffinger Friedland Dobrish Bernfeld & Stern, P.C., New York City (Stephen L. Weiner, of counsel), for defendant.

## OPINION & ORDER

EDELSTEIN, District Judge:

Count One of Indictment 90 Cr. 913 charges the defendant, Richard Love a/k/a "Ronnie" ("Love" or "defendant"), and others with conspiring to distribute and possessing with intent to distribute more than one kilogram of heroin, as well as quantities of other narcotics, in violation of 21 U.S.C. § 846. Count Eighteen charges defendant with using and carrying two firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

Defendant has filed several pretrial motions. Defendant seeks the suppression of intercepted telephone communications, evidence gathered by pen register devices, evidence seized from an apartment, and certain post-arrest statements made by Love. In addition, defendant seeks dismissal of this Indictment, arguing that continued prosecution would violate his right to a speedy trial. Finally, defendant moves for extensive pretrial discovery. For the reasons discussed below, defendant's motions are denied.

### I. WIRETAPS

On March 6, 1990, Judge Leonard B. Sand issued an order authorizing the interception of oral communications over (212) 292–9440, a telephone used by one of Love's co-defendants in this case, Justine Roberts, which was located in Apartment 2S, 575 East 140th Street, Bronx, New York. The order was issued on the basis of an affidavit sworn to by Special Agent Edward J. Dzialo on March 6, 1990 ("March 6, 1990 Dzialo Aff.").

On April 11, 1990, upon the expiration of the initial wiretap order, Judge Sand signed an order extending the government's authority to intercept conversations over Roberts' telephone for an additional thirty days. Judge Sand's April 11, 1990 extension order was issued on the basis of an affidavit sworn to by Agent Dzialo on that date ("April 11, 1990 Dzialo Aff.").

On November 6, 1990, Judge Milton Pollack signed an order authorizing a wiretap on (212) 665–4636, the telephone number used by Justine Roberts at that time inside her apartment at 575 East 140th Street. The order was issued on the basis of an affidavit sworn to by Special Agent Hope Wittman on November 6, 1990 ("Wittman Aff.").

Love contends that the evidence obtained from these court authorized wiretaps should be suppressed because the government failed to establish the inadequacy of normal investigative procedures in the various applications submitted. In addition, Love argues that suppression of this evidence is mandated because the first periodic report ("First Periodic Report") for the wiretap authorized by Judge Sand on March 6, 1990 was received and reviewed by the Part I judge, Judge Vincent L. Broderick, rather than by Judge Sand.

### A. Other Investigative Techniques

Defendant argues that the intercepted conversations were unlawfully intercepted because the government did not establish that normal investigative techniques had failed or were unlikely to succeed. Pursuant to 18 U.S.C. § 2518(1)(c), an application for interception of wire communications or other electronic surveillance must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." This requirement is to be construed in a "common sense and realistic fashion." *United States v. Ivic*, 700 F.2d 51, 57 (2d Cir.1983) (citation omitted). The purpose of this requirement is not to preclude the use of electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents, but to "require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the normal law enforcement methods." *United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.) (citation omitted), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). A reasoned explanation grounded in the facts of the case, which squares with common sense, is all that is required. In this regard, the Second Circuit has stated that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation."

*United States v. Young*, 822 F.2d 1234, 1237 (2d Cir.1987) (quoting *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976)).

The March 6, 1990 Dzialo affidavit sets out the investigative techniques used and fully explains the reasons for resorting to electronic surveillance. According to this affidavit, as of March 6, 1990, the government had used in its investigation of this matter, *inter alia*, confidential informants, an undercover agent making undercover purchases, consensually monitored telephone calls, physical surveillance, and analysis of telephone toll records and pen register information. According to the affidavit, these investigative techniques, and other available investigative techniques that were not used, failed or appeared likely to fail because (1) physical surveillance provided little information about the significance of meetings, the identity of some of the individuals involved, and their roles in the meetings (March 6, 1990 Dzialo Aff., at ¶¶ 28, 36, 43(a), (b) & (c)); (2) pen registers and telephone toll records were helpful but were incapable of providing agents with the substance of the discussions or the identities of participants (*id.* at ¶ 43(c)); (3) use of a federal grand jury did not appear promising because those who could provide additional information about the alleged conspiracy were themselves alleged members of the conspiracy (*id.* at ¶ 43(d)); (4) there were problems inherent in the use of investigative grand juries and interviews because such techniques would have alerted the subjects to the investigation (*id.*); (5) many of the co-conspirators had not yet been identified and the government did not wish to immunize co-conspirators whose roles in the enterprise were sufficiently serious such that the grant of immunity would frustrate, rather than serve, the public interest (*id.*); (6) those believed to be lower level confederates were unlikely to provide substantial information concerning how the higher-level confederates ran the enterprise (*id.*); (7) applications for search warrants would have been premature as the investigation had not revealed with any degree of certainty the locations where the targets of the investigation hid their heroin or other evidence of narcotics trafficking (*id.* at ¶ 43(e)); (8) the results of any searches would not have been likely to identify unknown conspirators or sources of supply, or to reveal the nature and extent of the enterprise (*id.* at ¶ 43(f)); (9) further use of undercover agents or confidential informants was not likely to be successful because it would have been unlikely that either could have infiltrated the organization to the degree necessary to obtain the type of information that could be retrieved through the interception of wire communications (*id.* at ¶ 43(f)); and (10) the two confidential informants used in the investigation were not in a position to provide detailed intelligence about the full scope of the conspiracy (*id.*).

Judge Sand's April 11, 1990 extension order was issued on the basis of an affidavit sworn to by Agent Dzialo on that date. Agent Dzialo's April 11 affidavit stated that conversations intercepted in the previous thirty days had revealed a widespread narcotics conspiracy involving at least twenty individuals, many of whom were not fully identified. The affidavit reviewed the pertinent conversations that had been intercepted and, once again, reviewed the reasons why electronic surveillance was necessary. Agent Dzialo averred that (1) physical surveillance of relevant locations was difficult because it attracted attention and raised the risk that the targets of the investigation might become alerted (April 11, 1990 Dzialo Aff., at ¶ 114(a)–(c)); (2) the subjects of the investigation were particularly concerned about police activity, had referred to the presence of police, and appeared to be alert to the possibility of police surveillance (*id.*); (3) although helpful, pen registers and telephone toll records could not help the agents to identify the source of co-conspirator's heroin supply (*id.* at ¶ 114(c)); and (4) the same concerns set forth in the initial wiretap application regarding the use of grand jury investigation, search warrants, undercover officers, and confidential informants continued to be relevant to the choice of investigative methods (*id.* at ¶ 114(d)–(f)).

Judge Pollack's November 6, 1990 wiretap order was issued on the basis of an affidavit sworn to by Agent Wittman on that date. Agent Wittman discussed the investigative

techniques that had been used, and the need for further electronic surveillance, focusing on an alleged source of heroin. Agent Wittman (1) reviewed the use of physical surveillance during the investigation, and in particular discussed the use of this particular investigative technique in identifying an alleged heroin supplier (Wittman Aff., at ¶¶ 32–34, 107(a)); (2) described in detail the heroin supplier's efforts to conceal his identity from his customers, the futility of physical surveillance because of the supplier's awareness of surveillance and because the investigating agents had no knowledge of the supplier's address or place of business (*id.* at ¶ 107(a)); (3) informed the court of the extensive use of toll records and pen registers in the case, and reported that the information gleaned from these techniques had not revealed the heroin supplier's residential or business telephone, and further use of these techniques was unlikely to do so (*id.* at ¶ 107(d) & (e)); (4) stated that search warrants would be wanting because agents had no information concerning where the heroin supplier received, concealed, or distributed the narcotics he sold, or the proceeds thereof (*id.* at ¶ 107(d)); and (5) concluded that electronic surveillance was necessary in order to identify the heroin supplier and to discover the full extent of the narcotics trafficking of Justine Roberts and her alleged co-conspirators, to identify their suppliers, associates, and customers, and to discover how they disposed of their narcotics proceeds (*id.* at ¶¶ 108, 109).

In sum, in each wiretap application in this investigation, the government explained to the issuing judge the investigative techniques that had been used, and why electronic surveillance was necessary. The affidavits made a sufficient showing of why other investigative techniques were unsuccessful or would have been unlikely to succeed. Accordingly, Love's motion to suppress for failure to establish the inadequacy of normal investigative techniques and the need for electronic surveillance is denied.

### B. The First Periodic Report

■ Defendant next raises a novel argument for suppression. Love contends that the wiretap evidence must be suppressed because the First Periodic Report was reviewed by Judge Broderick, the Part I judge, rather than by the issuing judge. This argument is devoid of merit.

As already discussed, Judge Sand issued the March 6, 1990 Order that authorized interception of communications over the telephone line used by Justine Roberts. In that Order, Judge Sand required the government to deliver "to the Court periodic reports at ten day intervals showing the progress that has been made toward achievement of the authorized objectives and the need for continued interception." (March 6, 1990 Order, at 6–7).

The First Periodic Report was timely submitted to the court by the government on March 16, 1990. Because Judge Sand was unavailable, the First Periodic Report was referred to the Part I [1] judge, Judge Broderick. Judge Broderick reviewed and signed the First Periodic Report on March 16, 1990. Love avers that this procedure was improper because, according to Love, the March 6, 1990 Order and 18 U.S.C. § 2518(6) require that periodic reports be reviewed and signed by the issuing judge.

Love's interpretation of the March 6, 1990 Order and 18 U.S.C. § 2518(6) is incorrect. The March 6, 1990 Order required only that periodic reports be delivered to the court. The government complied with this requirement, delivering the First Periodic Report to the court on the day that the report was due. The First Periodic Report was reviewed and signed by the Part I judge rather than by Judge Sand only because Judge Sand was unavailable to review it. The government thus complied with both the letter and spirit of the March 6, 1990 Order.

Moreover, Love's argument that the government violated 18 U.S.C. § 2518(6) by timely delivering the First Periodic Report to the court to be reviewed by the Part I judge

---

**1.** Rule 3 of the Southern District Rules for the Division of Business Among District Judges provides: "Part I is established for hearing and determining certain emergency and miscellaneous matters in civil and criminal cases and for processing criminal actions and pleadings through the pleading stage."

is wholly without support in the statute. 18 U.S.C. § 2518(6) provides that "[w]henever an order authorizing interception is entered pursuant to this chapter, the order *may* require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception." (emphasis added). The purpose of this provision is to *authorize* the court to require the government to submit to the court periodic reports as an oversight mechanism. It does not *mandate* those reports; nor does it prohibit review of periodic reports by the Part I judge during periods in which the issuing judge is unavailable. Indeed, review of periodic reports by the Part I judge—who upon receipt of the periodic report has access to any prior proceedings or orders in that case—fulfills the purpose of the periodic reports by allowing the court to oversee authorized wiretaps. Thus, Love's arguments in this regard are unavailing. Love's motion to suppress the wiretap evidence because the First Periodic Report was reviewed and signed by a judge other than the issuing judge is denied.

## II. EVIDENCE SEIZED BY PEN REGISTER DEVICES

 Love seeks suppression of all evidence seized by means of pen register devices. It is well settled that the use of pen register devices does not violate a defendant's expectation of privacy and therefore need not be authorized by a warrant based on probable cause. *Smith v. Maryland,* 442 U.S. 735, 739–46, 99 S.Ct. 2577, 2579–83, 61 L.Ed.2d 220 (1979). Love argues, however, that because some pen register devices can be converted into listening devices, any evidence gathered in this case by means of a pen register device must be suppressed. Love relies on *People v. Bialostok,* 80 N.Y.2d 738, 742, 594 N.Y.S.2d 701, 610 N.E.2d 374 (1993), to support his argument.

In *Bialostok,* the New York Court of Appeals held that, under provisions of the New York Criminal Procedure Law, pen register devices that are capable of being converted into listening devices may not be used without a warrant based on probable cause. The New York Court of Appeals found that evidence must be suppressed if obtained through the use of pen registers that are capable of being converted into listening devices, even where there is no evidence that the pen register devices actually were converted into listening devices or that any conversations were overheard.

The *Bialostok* decision did not concern an alleged violation of constitutional rights or an alleged violation of Title III's requirements. Rather, the issue in *Bialostok* was "not the reasonableness of the search but statutory compliance." *Bialostok,* 80 N.Y.2d at 744, 594 N.Y.S.2d 701, 610 N.E.2d 374. The *Bialostok* decision was based entirely on the New York Court of Appeals' interpretation of New York State law.

Indeed, federal courts that have considered this issue have refused to impose the *Bialostok* holding on *Smith v. Maryland* and its progeny. For example, in *United States v. Shnayderman,* 1993 WL 524782 (E.D.Pa. Dec. 17, 1993), the court rejected the same argument made here by Love. The *Shnayderman* court held that the ruling in *Bialostok* was based "entirely on the requirements of the New York Procedure Law, not upon the Fourth Amendment." *Shnayderman,* 1993 WL 524782, *slip op.,* at *1. The *Shnayderman* court further held that, because there was no evidence that the pen register devices had actually been converted into listening devices, *Smith v. Maryland* governed treatment of evidence derived from the pen register devices, and the evidence at issue in *Shnayderman* would not be suppressed.

In the instant case, there is no evidence that the pen register devices were converted into listening devices prior to the government's Title III application. Agent Dzialo, the case agent responsible for the investigation of this matter, has submitted to the Court an affidavit, dated March 18, 1994 ("March 18, 1994 Dzialo Aff."), in which he avers that, prior to the Title III application authorizing the interception of wire communications, (1) the pen register devices were operated by the Special Operations Unit of the FBI, which is independent of the unit that was investigating this case; (2) the Special Operations Unit had little or no knowl-

edge of the underlying investigation and therefore had no reason to intercept communications; (3) no member of the Special Operations Unit ever informed Agent Dzialo that any conversations had been overheard during the course of the investigation utilizing the pen register devices; (4) no attempt was ever made to use the pen registers to overhear conversations prior to the issuance of Title III authorization; and (5) the only evidence derived from the pen registers was, to Agent Dzialo's knowledge, pen register printouts listing the telephone numbers dialed on subject telephones. (March 18, 1994 Dzialo Aff., at ¶¶ 2, 3).

Moreover, as noted above, *Bialostok* was based entirely on a New York statute. It therefore has no bearing on this case. I find that, in the absence of evidence that pen register devices were in fact used to intercept communications prior to the issuance of an order permitting such interception, pen register evidence should not be suppressed. Thus, I find Love's motion to suppress the evidence derived from the pen register devices to be without merit.

### III. EVIDENCE SEIZED FROM APARTMENT 2F, 1075 NELSON AVENUE, BRONX, NEW YORK

On December 11, 1990, Magistrate Judge James C. Francis, IV, issued arrest warrants for twenty-three individuals, including Love, and search warrants covering several apartments. One of these search warrants authorized agents to search Apartment 2F, 1075 Nelson Avenue, Bronx, New York ("Apartment 2F"), allegedly occupied at that time by Love and a co-defendant, Clementine Roberts. This search warrant authorized the seizure from Apartment 2F of, *inter alia,* narcotics; narcotics diluents; narcotics paraphernalia; firearms; paging devices; monies which are the proceeds of narcotics trafficking; telephone and address books reflecting the names, addresses, and telephone numbers of co-conspirators; and books and records reflecting narcotics sales and the disposition of narcotics proceeds. The arrest and search warrants were issued on the basis of a complaint and affidavit sworn to on December 11, 1990 by Special Agent Dzialo ("Dec. 11, 1990 Dzialo Aff.").

On December 12, 1990, agents executed the search warrant for Apartment 2F. During this search, agents recovered, among other things, various containers of white powder later determined to contain detectable amounts of heroin and cocaine; full and empty glassine envelopes and plastic vials; a triple-beam scale; a loaded .38 caliber revolver; a loaded .25 caliber semi-automatic pistol; ammunition; an address book; and a beeper. Love seeks to suppress the physical evidence seized from Apartment 2F. As grounds for suppression, Love avers that the warrant authorizing the search was not supported by probable cause, that the evidence presented to Magistrate Judge Francis was stale, and that the agents' reliance upon the warrant was not objectively reasonable.

█ In order to suppress evidence seized pursuant to a search warrant, a defendant must demonstrate that (1) there was inadequate probable cause to support the issuance of the warrant, and (2) even if the warrant was invalid for lack of probable cause, the officers who executed the search failed to act in objectively reasonable reliance upon the subsequently invalidated warrant. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

█ Two factual showings are required to establish probable cause to search a residence: (1) that a crime has been committed; and (2) that there is probable cause to believe that evidence of such a crime is located at the residence. *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983) (citations omitted). A Magistrate Judge's finding of probable cause is entitled to substantial deference. *Id.* Nonetheless, this Court must examine whether "the magistrate performed his neutral and detached function on the facts before him, and did not merely serve as a rubber stamp for conclusions drawn by the police." *Id.* In making such a determination, the standard is that there be a "fair probability" that the premises would yield the objects specified in the search warrant. *Illinois v. Gates,* 462 U.S. 213, 283, 103 S.Ct. 2317, 2356, 76 L.Ed.2d 527 (1983); *Travisano,* 724 F.2d at 346. This standard is one of

"probability, and not a *prima facie* showing of criminal activity." *Id.* Finally, a Magistrate Judge's finding of probable cause "is itself a substantial factor tending to uphold the validity of [the] warrant." *Id.* at 345 (citations omitted).

■ If the reviewing court determines that the search warrant was not supported by probable cause, after according the appropriate deference to the prior determination, the court will nevertheless deny the motion to suppress if it determines that the officers who conducted the search acted in good faith reliance upon the warrant. The exclusionary rule should not be applied where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon,* 468 U.S. at 922, 104 S.Ct. at 3420.

■ The affidavits that formed the basis of the challenged search warrant provided more than ample probable cause for the issuance of that warrant. For example, intercepted telephone communications yielded numerous narcotics-related conversations among Justine Roberts, Clementine Roberts, and Ronald Love, during which the three discussed, among other things, Love's role as a heroin supplier to the conspiracy (Dec. 11, 1990 Dzialo Aff., at ¶¶ 144, 206, 208, 212, 215, 216, 225, 227, 241, 252, 255, 258); Clementine Roberts' and Ronald Love's distribution of narcotics in Baltimore (*id.* at ¶¶ 59, 69, 134); the quality and price of Love's heroin (*id.* at ¶¶ 140, 225, 227, 241); and Love's collection of narcotics proceeds (*id.* at ¶¶ 165, 206, 208, 435). These intercepted communications also yielded evidence that Love used a paging device (*id.* at ¶¶ 69, 80), and regularly carried firearms (*id.* at ¶¶ 108, 244). Moreover, Special Agent Dzialo's affidavit contained his expert opinion—based on five years with the Organized Crime Drug Enforcement Task Force and his participation in numerous narcotics investigations—that certain particularized categories of evidence would be found in Apartment 2F (*id.* at ¶ 475). A government agent's expert opinion "is an important factor to be considered by the judge when making a probable cause determination." *United States v. Benevento,* 836 F.2d 60, 71 (2d Cir.1987), *cert. denied,* 486 U.S. 1043, 108

S.Ct. 2035, 100 L.Ed.2d 620 (1988). In sum, the record is replete with support for Magistrate Judge Francis' conclusion that evidence of narcotics trafficking activities would likely be found in Apartment 2F. Thus, I find that ample probable cause existed, based on evidence that was not stale, to support the issuance of the search warrant for Apartment 2F.

■ Further, Love has failed to show that the government's reliance on the warrants was not objectively reasonable. *See Leon,* 468 U.S. at 926, 104 S.Ct. at 3422. Contrary to Love's view, the affidavit submitted in support of the warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 926, 104 S.Ct. at 3422. Indeed, the affidavit establishes ample probable cause for the issuance of the warrant.

Love's motion to suppress the physical evidence found in Apartment 2F is therefore denied.

## IV. POST–ARREST STATEMENTS

Love moves to suppress his post-arrest statements on two grounds. First, Love argues that there was no probable cause for his arrest. Second, Love avers that he did not and could not legally waive his Sixth Amendment rights in the absence of counsel. Both of these arguments are without merit.

### A. Probable Cause

■ Love's first argument is utterly without merit. The December 11, 1990 affidavit of Agent Dzialo in support of Love's arrest warrant demonstrated sufficient probable cause to believe that Richard Love, a/k/a/ "Ronnie" was involved in narcotics trafficking and regularly carried firearms in connection with this illegal activity. Moreover, Love ultimately was arrested on a warrant issued on the basis of an indictment. This Indictment in and of itself establishes probable cause to believe that Richard Love a/k/a/ "Ronnie" committed the offenses charged therein. Hence, Love's first argument is without merit.

## B. Sixth Amendment

 Love has also failed to show that his Sixth Amendment rights were violated. The legal principles governing post-arrest questioning are well settled. Before a custodial interrogation, suspects must be informed of their right to remain silent and their right to the assistance of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). These rights may be waived if the waiver is knowing, intelligent, and voluntary, but if a suspect requests counsel, all interrogation must cease until an attorney is present. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). Questioning may not resume without an attorney present unless the defendant initiates further discussions with the police and knowingly and intelligently waives the right that he had invoked. *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984).

 Deputy United States Marshal Matthew Healey, a member of the United States Marshals Service's Warrant Squad, participated in the arrest of Love on April 9, 1993. Deputy Healey has submitted to this Court an affidavit ("Healey Aff.") in which he avers that Love was read his *Miranda* rights upon arrest. (Healey Aff., at ¶ 5). Deputy Healey avers that, after Love was read his *Miranda* rights, Love made certain statements to Deputy Healey. (*Id.*). Love does not dispute this, but rather has submitted to this Court a reply affidavit dated April 17, 1994 ("Love Reply Aff.") in which he states that he does not *"remember* Deputy United States Marshal Healey advising [him] of [his] Miranda warnings nor does [he] *recall* making the statement that [Deputy Healey] attributes to [him]." (Love Reply Aff., at ¶ 2) (emphasis added). Love does not contend that he requested an attorney or that he was denied representation prior to making the post-arrest statements that he seeks to suppress.

Love has failed to establish a factual basis for the conclusion that his rights were violated. In fact, Love's Reply Affidavit, and the affirmation of his counsel submitted in support of Love's pretrial motions ("Weiner Aff."), do not even raise an issue of fact in this regard. Love merely alleges that he cannot recall whether or not he was read his *Miranda* rights. On this record, and in light of Deputy Healey's affidavit swearing that Love was read his *Miranda* rights, Love's inability to recollect whether he was informed of his *Miranda* rights does not require suppression of his post-arrest statements.

 Finally, Love argues that, because he had already been indicted at the time of his arrest, he "should not have been asked to waive, and was legally incapable of waiving" his constitutional rights in the absence of counsel. (Weiner Aff., at ¶¶ 29–34). In *Patterson v. Illinois*, 487 U.S. 285, 292–97, 108 S.Ct. 2389, 2394–97, 101 L.Ed.2d 261 (1988), the Supreme Court considered and rejected this argument. The *Patterson* Court held that *Miranda* warnings are sufficient in the context of post-indictment questioning. *Patterson*, 487 U.S. at 298, 108 S.Ct. at 2397; *see United States v. Charria*, 919 F.2d 842, 848 (2d Cir.1990) ("[G]iving an indicted defendant *Miranda* warnings is sufficient to make 'knowing and intelligent' his waiver of the Sixth Amendment right to counsel, even if the defendant has not been expressly informed of the indictment pending against him."), *cert. denied,* —— U.S. ——, 112 S.Ct. 62, 116 L.Ed.2d 38 (1991). Thus, Love's argument that he was incapable of waving his right to counsel in the absence of counsel is without merit.

Accordingly, Love's motion to suppress his post-arrest statements is denied.

## V. SPEEDY TRIAL

Defendant next contends that continued prosecution would violate his right to a speedy trial under both the Sixth Amendment and the Speedy Trial Act. In papers prepared and submitted on Love's behalf by his counsel, defendant argues that, because he was arrested twenty-seven months after the Indictment was filed, and because the government "has not revealed what efforts it made to execute the arrest warrant," the blame for the delay in Love's trial "must fall on the government." (Weiner Aff., at ¶¶ 37–40). Accordingly, defendant argues, the Indictment must be dismissed. Independent of

those papers submitted by his attorney, Love has submitted to this Court a *pro se* brief arguing that further prosecution is prohibited by the Speedy Trial Act.

### A. The Speedy Trial Act

 18 U.S.C. § 3161(c)(1) provides that, In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

Under 18 U.S.C. § 3161(h), certain periods of time are, or may be, excluded from speedy trial calculations. Several of these exclusions are relevant to the consideration of Love's Speedy Trial Act argument. For the reasons discussed below, the period of time from the filing of the Indictment to April 9, 1993, and from April 13, 1993 to the date of this Opinion, clearly is excluded.

Love was a fugitive for approximately twenty-seven months. The record reflects that, although the government devoted considerable resources to locating Love, Love successfully evaded arrest. This period of time, from the filing of the Indictment to Love's arrest on April 9, 1993, is excluded from speedy trial calculations. 18 U.S.C. § 3161(h)(3)(A).

Love first appeared before this Court on April 13, 1993. At that time, Love pleaded not guilty to the charges contained in the Indictment. *See United States v. Love*, 90 Cr. 913 (DNE) (April 13, 1993 Hearing Transcript). At the April 13, 1993 hearing, Love's attorney, Bruce McIntyre, informed this Court that Love wished to file pretrial motions and, accordingly, this Court set a motion schedule. *Id.* at 15. The Court ordered that the period of time from the April 13, 1993 hearing until the final adjudication of Love's pretrial motions be excluded from speedy trial calculations. *Id.; see* 18 U.S.C. §§ 3161(h)(1)(F), 3161(h)(1)(J), and 3161(h)(8). This exclusion was designed to guarantee the effectiveness of counsel and to prevent any possible miscarriage of justice; the Court found that the value of this exclusion outweighed the best interests of the defendant and the public in a speedy trial. *See United States v. Love*, 90 Cr. 913 (DNE) (April 13, 1993 Hearing Transcript), at 15. Thereafter, defendant requested several extensions of time to file pretrial motions, each of which was granted.

On June 21, 1993, defendant filed a motion seeking to relieve his then counsel, Mr. McIntyre, and requesting the appointment of replacement counsel. At this point, defendant still had not submitted any pretrial motions. This Court granted Love's motion, relieved Mr. McIntyre, and new counsel was appointed. At a hearing held on July 28, 1993, Love's incoming counsel, Stephen L. Weiner, informed this Court that defendant wished to pursue plea negotiations with the government and, in addition, would need several additional months to adequately prepare pretrial motions in the event that plea negotiations did not prove fruitful. This Court granted an exclusion of time for defendant to pursue plea negotiations, continued the previously stated exclusion of time for defendant to file pretrial motions, and adjourned the hearing until August 17, 1993. *United States v. Love*, 90 Cr. 913 (DNE) (July 28, 1993 Hearing Transcript); *see* 18 U.S.C. §§ 3161(h)(8), 3161(h)(1)(F), and 3161(h)(1)(J). On August 17, 1993, the Court set a new motion schedule, and once again reiterated that the time until the final adjudication of Love's pretrial motions was excluded from speedy trial calculations.

In January 1994, defendant once again requested additional time to file pretrial motions. In a memorandum endorsement dated January 12, 1994, this Court extended Love's time to file motions until January 24, 1994, again noting that the time until final adjudication of these motions was excluded from speedy trial calculations. On April 5, 1994, the government and Love stipulated to an extension of time for Love to file reply papers. This Court approved this stipulation.

Finally, because Love had failed to brief certain issues in his moving papers, this Court called for supplemental briefs. On

July 7, 1994, defendant requested an extension of time to file his supplemental brief. An extension was granted, and defendant filed a supplemental memorandum of law on July 20, 1994. The government filed a response to defendant's supplemental memorandum of law on August 3, 1994. Thus, defendant's motion became fully submitted on August 3, 1994.

Therefore, the period of time from the filing of the Indictment to defendant's arrest on April 9, 1993 and the period of time from April 13, 1993 to the date of this Opinion[2] is excluded from speedy trial calculations. *see* 18 U.S.C. §§ 3161(h)(1)(F), 3161(h)(1)(J), and 3161(h)(8); *see also Henderson v. United States,* 476 U.S. 321, 326–31, 106 S.Ct. 1871, 1874–77, 90 L.Ed.2d 299 (1986) (discussing exclusion of time under 18 U.S.C. § 3161(h)(1)(F). Accordingly, Love's *pro se* Speedy Trial Act motion is without merit.

*B. Sixth Amendment Right to a Speedy Trial*

 Defendant next argues for dismissal of the Indictment on the grounds that further prosecution would violate his Sixth Amendment right to a speedy trial. Under *Barker v. Wingo,* 407 U.S. 514, 528–32, 92 S.Ct. 2182, 2191–93, 33 L.Ed.2d 101 (1972) four factors must be considered in order to ascertain whether a defendant's Sixth Amendment right to a speedy trial has been violated. *See also Doggett v. United States,* —— U.S. ——, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992); *United States v. Vassell,* 970 F.2d 1162 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 627, 121 L.Ed.2d 559 (1992). These four factors are (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the extent of prejudice

to the defendant. Of these four factors, only the first factor—the length of the delay—weighs in favor of defendant's motion. This factor, however, is greatly outweighed by the remaining three factors.

In evaluating the second factor, the reason for the delay, the Court must determine whether the government or the defendant is more responsible for the delay. *Doggett,* —— U.S. at ——, 112 S.Ct. at 2690. Responsibility for the delay in the instant case rests entirely on Love. On December 11, 1990, Magistrate Judge Francis issued warrants for Love and twenty-two other individuals. Twenty-two of the twenty-three arrest warrants were executed on December 12 and December 13; Love, the remaining defendant, escaped apprehension at that time, and remained a fugitive until his arrest by United States Marshals on April 9, 1993. It appears from the record that while he remained a fugitive, Love repeatedly changed location and periodically altered his appearance in order to evade apprehension. During this time, the FBI and the United States Marshals Service devoted considerable time and resources to locating Love. (Healey Aff., at ¶¶ 2, 4). In addition, on August 25, 1992 and March 5, 1993, the United States Attorney for the Southern District of New York sought and obtained orders requiring the production of beeper and telephone records in order to ascertain Love's whereabouts. (March 18, 1994 Affidavit of Assistant United States Attorney Deborah E. Landis, at ¶ 10 & Exh. I). Upon his arrest, Love purportedly admitted to Deputy Marshal Healey that he had been aware that he was being sought by the government. (Healey Aff., at ¶ 5). On the record before the Court, then, it is clear that the government vigorously sought

---

**2.** It should be noted that, at a pretrial conference held on August 8, 1994, defendant informed this Court that he would not be prepared to go to trial until November 7, 1994. *See United States v. Love,* 90 Cr. 913 (DNE) (Aug. 8, 1994 Hearing Transcript), at 4. After discussions with the Court, defendant agreed that he would be prepared to go to trial on October 12, 1994. *Id.* at 7–8. This Court thus scheduled trial to begin on October 12, 1994, at 9:30 a.m. Defense counsel and Love stated on the record that this date was acceptable and that an exclusion of time from the date that this Opinion is filed until October 12,

1994 is appropriate. *Id.* at 4, 6–8. The government concurred. *Id.* at 7. Accordingly, this Court excluded from speedy trial calculations the period of time from the determination of defendant's pretrial motions until October 12, 1994. *Id.* at 8–9. As the Court stated on the record, this exclusion is designed to serve the interests of justice by ensuring continuity of counsel and providing defendant adequate time to prepare his defense. *Id.* The Court found that the value of this exclusion outweighs the best interests of the defendant and the public in a speedy trial. *Id.; see also* 18 U.S.C. § 3161(h)(8).

to ascertain Love's whereabouts. Love successfully evaded capture until April 9, 1993. Finally, the delay in holding the trial *following* defendant's arrest is also attributable to defendant. Defendant repeatedly has requested and received extensions of time to file motion papers and for other reasons. *See, infra,* at 736–737. The second factor thus weighs against Love's motion.

The third factor, the defendant's assertion of his right to a speedy trial, also weighs against Love's motion. During the period that Love remained a fugitive, he took no action to assert his right to a speedy trial. Indeed, the converse appears to be true. In light of the fact that Love apparently was aware that he was wanted in connection with this Indictment, Love's failure to assert his right to a speedy trial weighs against his motion. As already discussed, defendant also has not requested a prompt disposition of this case; rather, defendant has prolonged these proceedings by requesting extensions of time to file motion papers.

Finally, the fourth factor, the extent of prejudice to the defendant, also does not support Love's motion. Love conclusorily alleges that he has been prejudiced by delay insofar as he has been incarcerated, his memory of relevant events may have faded, and witnesses may have died. (Love Reply Aff., at ¶ 7). These conclusory allegations do not support a finding of prejudice to the defendant.

In sum, Love has failed to demonstrate that his Sixth Amendment right to a speedy trial has been violated. Accordingly, Love's speedy trial motion is denied.

## VI. DISCOVERY

Love next moves for a bill of particulars as well as extensive pretrial discovery. Love seeks virtually all of the evidence that the government might have in its possession, whether or not the government intends to introduce that evidence at trial. For the reasons discussed below, defendant's discovery requests are denied.

 Love requests a bill of particulars detailing such information as when and where he carried the firearms referred to in

Count Eighteen, and whether the conspiracy alleged in Count One is the same conspiracy referred to in Count Eighteen. It is well settled that the purpose of a bill of particulars is to provide facts supplemental to those contained in an indictment that are necessary to apprise a defendant of the charges against him with sufficient precision (1) to prepare a defense, (2) to avoid unfair surprise at trial, and (3) to preclude a second prosecution for the same offense. *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *see United States v. Cephas,* 937 F.2d 816, 823 (2d Cir.1991). The crucial question is whether the information sought is *necessary,* not whether it is *helpful. United States v. Leighton,* 265 F.Supp. 27, 35 (S.D.N.Y.1967), *aff'd,* 386 F.2d 822 (2d Cir. 1967), *cert. denied,* 390 U.S. 1025, 88 S.Ct. 1412, 20 L.Ed.2d 282 (1968). A bill of particulars is not required where a reasonably diligent attorney is furnished with all the information needed to prepare for trial. *United States v. Panza,* 750 F.2d 1141, 1148 (2d Cir.1984).

 In this case, the Indictment is quite detailed: The Indictment sets forth eighty overt acts in the narcotics conspiracy count alone. In addition, the government has made available to defense counsel other evidence, including information regarding pretrial statements made by Love, Love's criminal record, cassette tapes of court-authorized wiretaps, documents and tangible objects, laboratory reports, wiretap applications, and several affidavits of investigating agents. Finally, the government has voluntarily provided to Love other relevant information regarding the firearms that were recovered by the government. *See Government's Response to Love's Supplemental Memorandum of Law,* at 1. In sum, the information that has been provided to Love is more than sufficient to apprise defendant of the charges against him so that he can prepare a defense, avoid unfair surprise at trial, and preclude a second trial for the same offense. Accordingly, defendant's application for a bill of particulars is denied.

 Defendant's remaining requests for pretrial discovery are similarly without mer-

it. These requests—the majority of which are made without legal support or any attempt to show why they are necessary—encompass virtually every conceivable type of evidence that the government might or might not offer during Love's trial. For example, one of Love's requests seeks disclosure of the names and addresses of persons interviewed by the government and persons whom the government intends to call as witnesses at trial. The government may be required to produce a witness list only if the defendant makes a "particularized showing of need." *United States v. Wilson,* 565 F.Supp. 1416, 1438 (S.D.N.Y.1983), *aff'd,* 750 F.2d 7 (2d Cir.1984), *cert. denied,* 479 U.S. 839, 107 S.Ct. 143, 93 L.Ed.2d 85 (1986). This showing must go "beyond the obvious assertion that such a list would facilitate preparation for trial." *United States v. Nezaj,* 666 F.Supp. 494, 503 (S.D.N.Y.1987) (citation omitted). Defendant has failed to make any such showing. Accordingly, defendant's request for disclosure of the names and addresses of persons interviewed by the government and persons whom the government intends to call as witnesses at trial is denied.

In addition, Love seeks the identity of the confidential informants in the government's investigation. "[D]isclosure of the identity or address of a confidential informant is not required unless the informant's testimony is shown to be material to the defense." *United States v. Saa,* 859 F.2d 1067, 1073 (2d Cir.1988), *cert. denied,* 489 U.S. 1089, 109 S.Ct. 1555, 103 L.Ed.2d 858 (1989). Defendant has failed to make such a showing. Accordingly, defendant's motion is denied.

Love also seeks disclosure of numerous books, papers, documents, tangible objects, and other materials that may have been obtained from other defendants charged in the Indictment. Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure governs discovery of documents and tangible objects. The government represents that it has complied with Rule 16(a)(1)(C) and that if it becomes aware of additional material discoverable under this rule, it will provide it promptly to defendant. Accordingly, defendant's request is denied.

Defendant also moves for the disclosure of materials under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, including *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). *Brady* was not intended to "supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States v. Le Roy,* 687 F.2d 610, 619 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). Further, *Brady* and its progeny do not require disclosure of *Brady* material before trial. *United States ex rel. Lucas v. Regan,* 503 F.2d 1, 3 n. 1 (2d Cir.1974), *cert. denied,* 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975). *Brady* or *Giglio* "impeachment" material is properly disclosed when the witness is called to testify at trial. *United States v. Percevault,* 490 F.2d 126, 131 (2d Cir.1974). The government represents that it will provide Love with any exculpatory material that has not yet been disclosed at the appropriate time and in sufficient time for Love to make good use of it at trial. *Government's Response to Love's Supplemental Memorandum of Law,* at 3. Nothing more is required. Finally, much of the information that Love seeks is available to Love through the transcripts of the trials of Love's co-defendants in this case. These transcripts are public documents. Accordingly, defendant's motion for pretrial discovery of this material is denied.

Moreover, defendant seeks written or recorded statements made by co-defendants and co-conspirators. As an initial matter, the government has made available to Love all tape recorded conversations that resulted from electronic surveillance and pretrial investigation. Consequently, defendant has access to those co-conspirator statements made during the course of the conspiracy. In addition, Love also has access to the transcripts of his co-defendants' trials. These transcripts contain other relevant statements.

■ To the extent that the defendant seeks other co-conspirator statements, the Second Circuit has held that "Rule 16(a) simply does not encompass these statements, nor does the Jencks Act permit their disclosure over the objection of the government." *Percevault,* 490 F.2d at 131; *see In re United States,* 834 F.2d 283, 287 (2d Cir.1987). Indeed, with respect to the *Jencks* or 3500 material that this request might encompass, the Second Circuit has ruled that district courts lack authority to order disclosure of witness statements before those witnesses testify. *United States v. Ruggiero,* 472 F.2d 599, 604 (2d Cir.), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973). Defendant's request is therefore denied.

## VII. CONCLUSION

For the reasons discussed above, defendant's pretrial motions are DENIED.

SO ORDERED.