OPINION OF THE COURT
Bernard J. Fried, J.
Defendants, all officers of Plumber’s Local Union No. 2 (Local 2), who are charged in a 183-count indictment with enterprise corruption (Penal Law § 460.20) and related crimes, move to suppress evidence obtained through court-authorized electronic eavesdropping.
In November 1990, after the investigation into alleged labor racketeering and other illegal conduct involving the plumbing industry had been underway for some time, the District Attorney applied for, and obtained, an order authorizing the installation of pen registers on three public telephones located at the Pelham Bay Diner in the Bronx. As required under CPL 705.10, there was the requisite showing of "reasonable suspicion” to authorize the use of a pen register in order to identify the telephone numbers dialed. This authorization was further extended in January 1991, and ultimately the District Attorney requested, and obtained, an eavesdropping warrant on the same telephones in February 1991, which was extended seven times through October 1991.
During the electronic surveillance at the Pelham Bay Diner, in July 1991, an order was obtained authorizing the installation of a pen register on the residential telephones of defendants Frank Martello, Peter Bishop and Melvin Goldsmith. In September 1991, eavesdropping warrants were obtained concerning these residential telephones. This electronic surveillance was extended, by court orders issued in October and November and amended in October to include Paul Martello. In January 1992, eavesdropping was discontinued on the telephones of Paul Martello and Peter Bishop, although the pen register orders were continued; the other eavesdropping warrants were also extended. In February 1992, a further warrant extension was obtained, limited to Frank Martello’s telephone, although the other pen registers were continued. In *410 April 1992 an eavesdropping warrant was obtained for Melvin Goldsmith’s residential telephone. This warrant was extended in May 1992. A separate pen register order was issued in November 1991 relating to Peter Salzarulo’s home telephone; as was one authorizing a pen register to be installed on the business telephone of "B.H. Motto & Co.”
Warrants authorizing electronic surveillance or a "bug” in the automobiles of Frank Martello and Peter Bishop were obtained in April 1991. That authorization was amended in May 1991 to include Melvin Goldsmith. These warrants were extended through September 1991. Although the Goldsmith car was dropped from the warrant in July, another such warrant was issued for Goldsmith’s car in October 1992 and extended in November 1992. Similar orders, authorizing a "bug” and pen register in the "J&C Hairstyling Boutique”, a barbershop in the Bronx, were obtained in April 1992 and extended in May 1992.
Perusal of the various affirmations submitted in support of the electronic surveillance shows references to numbers recorded by the court-authorized pen registers installed on the various telephone lines as described above. These affirmations also contain substantial additional information, which is unrelated to the use of the pen registers.
At the time of the installation and use of these pen registers, CPL 705.10 permitted the judicial authorization of such devices upon a showing of "reasonable suspicion” concerning a statutorily designated crime; probable cause was not required as was necessary for an eavesdropping warrant authorizing wiretapping or the use of a "bug” pursuant to CPL 700.15. Indeed, CPL 700.05 (1) explicitly excluded a pen register from the definition of "eavesdropping”. This all changed with the Court of Appeals February 25, 1993 decision People v Bialostok (80 NY2d 738), which held that a pen register, capable of monitoring conversations, should be treated as an eavesdropping device subject to the warrant requirements specified in the CPL, notwithstanding that the audio function was disabled or that no conversations were actually seized. Although the People do not contend that the pen registers here would not fall under the strictures of Bialostok, that is that they were not capable of acquiring the contents of actual conversations, nevertheless they contend that Bialostok should be applied to *411 its own facts,[1] or in the alternative, that it should not be retroactively applied.
The threshold issue, then, is the retroactivity of Bialostok (supra): if it is to be applied only prospectively, then the failure to obtain a warrant for the pen registers was not improper and the telephone numbers derived from their use was properly included in the various warrant applications. However, if the Bialostok holding is to be retroactively applied, then the information was improperly included and the warrants would be valid, only if the other evidence supplied established probable cause without the telephone number information.
Interestingly, this issue, which would affect the validity of wiretaps installed prior to Bialostok (supra) since many wiretap applications are preceded by a pen register, has not yet reached the Court of Appeals, although the Fourth Department, in People v LaMendola (206 AD2d 207 [4th Dept 1994]), has come down in favor of retroactivity. However, I am not bound by Appellate Division decisions, other than those of the First Judicial Department. (See, People v Waterman, 122 Misc 2d 489, 495, n 2 [Crim Ct, NY County 1984] [Lang, J.]; but see, Stewart v Volkswagen of Am., 181 AD2d 4, 7 [2d Dept 1992]; Mountain View Coach Lines v Storms, 102 AD2d 663, 664-665 [2d Dept 1984].) Rather, other Departments "are entitled to have their rulings accorded great respect and weight but adhering to those rulings is not mandatory” (People v Waterman, supra), and, since I disagree with LaMendola, for the reasons set forth below, I decline to follow its holding.
Before turning to the analysis of this issue, mention should be made of two other cases: People v Gilpin (190 AD2d 585 [1st Dept 1993] [Gilpin I], 216 AD2d 62 [1st Dept 1995] [Gilpin II]), and People v Giordano (211 AD2d 814 [2d Dept 1995]), which deal with appeals from convictions predating Bialostok (supra).
In Gilpin I (supra), decided seven days before Bialostok (supra) was handed down by the Court of Appeals, the First Department remanded the matter to the trial court for "a hearing to determine whether a modified pen register was used to conduct illegal electronic eavesdropping and, if so, whether any subsequently seized evidence was tainted by the use of *412 such device.” (Supra, at 585.) At the commencement of the remanded hearing, Bialostok was brought to the attention of the Trial Justice in the Supreme Court and its applicability was urged. However, the Trial Justice stated "I don’t consider Bialostok [sic] relevant to these proceedings in the totality of the picture here.” Following the hearing, the Judge found that the pen register was "convertible into a listening device by either a minor alteration or by adding a speaker or recording device * * * [But] [notwithstanding the potential for conversion, there was no illegal electronic eavesdropping * * * [And] assuming there had been a conversion and subsequent eavesdropping through the pen register, there is, nonetheless, sufficient independent, legally obtained evidence to support the issuance of the wire tap order.” Clearly, and a review of the trial court’s proceedings confirms this, the Judge did not consider the Bialostok issue, i.e., whether, after suppressing the telephone numbers obtained from the pen register, there was independent evidence to support subsequently obtained eavesdropping warrants. Rather what the Trial Judge decided was that there "was no illegal eavesdropping,” which, when read together with the Trial Judge’s statement that Bialostok was outside the scope of remanded proceedings, means that this was a determination that there was no aural evidence illegally obtained by the use of the pen register, not whether there was sufficient probable cause without consideration of the phone numbers dialed by the subject telephone.
Thereafter, in the Gilpin II memorandum decision (supra), the Appellate Division affirmed the conviction and stated that "[bjecause the pen register at issue had the capacity to be modified to overhear conversations, and was installed without prior judicial authorization by warrant, all evidence obtained from it should have been suppressed.” (People v Gilpin, 216 AD2d 62 [1st Dept 1995], citing Bialostok, supra.) This memorandum decision further stated "[h]owever, the evidence was sufficient to support the trial court’s finding that any error caused by warrantless installation of a pen register which was capable of being modified, but had not been modified, was harmless.” (Supra.) Inasmuch as the Bialostok issue was not considered at the hearing held pursuant to the remittitur, nor included in the trial court’s decision, this statement cannot be read as a holding by the First Department that Bialostok should be *413 retroactively applied.[2] This issue, then, is still undecided in this Department.
It also appears that the Second Department, which in People v Raventos (199 AD2d 429, 430 [2d Dept 1993]) wrote that "we express no opinion as to the retroactivity of the rule of the Bialostok case”, still has not decided the issue. The subsequent case of People v Giordano (supra), referring to Bialostok (supra) and affirming a 1991 conviction, is not a holding as to retroactivity; it merely states that there was evidence, independent of the pen register information, to provide probable cause for the eavesdropping warrant. Since the Second Department concluded that there was such independent evidence in the warrant applications, it had no need to examine the question of the retroactivity of Bialostok.
Retroactivity discussion has been the subject of several recent Court of Appeals decisions: People v Sprowal (84 NY2d 113 [1994]); People v Favor (82 NY2d 254 [1993]); and People v Mitchell (80 NY2d 519 [1992]), which have reaffirmed that the retroactivity rule, stated in People v Pepper (53 NY2d 213 [1981]), remains the law of New York. This rule, applicable to new decisional law which does not implicate Federal constitutional principles, is that courts "determine the retroactive effect of a new rule by evaluating three factors: (1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect on the administration of justice of retroactive application.” (People v Mitchell, supra, 80 NY2d, at 525-526, citing People v Pepper, supra.)
The threshold question, then, is whether the new rule in Bialostok (supra) implicates Federal constitutional law. If it does, then the Federal retroactivity rule must be followed, i.e., the new constitutional rule applies retroactively to all cases pending on direct appeal. (Griffith v Kentucky, 479 US 314 [1987].) If it does not apply retroactively, then the New York rule concerning prospective application governs.
Careful analysis of Bialostok (supra) mandates the conclusion, as stated by a Federal court, that Bialostok "was based entirely on the requirements of the New York Criminal Proce *414 dure Law, not upon the Fourth Amendment”. (United States v Shnayderman, 1993 WL 524782, at 1 [ED Pa 1993]; see also, United States v Love, 859 F Supp 725, 732 [SD NY 1994].) That this is so, is evident from the very language of Bialostok, where the opinion of Acting Chief Judge Simons pointed out that the issue was "not the reasonableness of the search but statutory compliance.” (United States v Love, supra, 859 F Supp, at 744 [emphasis added].)
This conclusion is not changed by the language in Bialostok which states that its interpretation of CPL article 700 ("Eavesdropping and video surveillance warrants”) "must be sensitive to the constitutional guarantees against search and seizure that the statute seeks to protect.” (People v Bialostok, at 745, supra.) Contrary to the view of the Third Department in LaMendola (supra), and People v Varacalli (154 Misc 2d 805 [Sup Ct, Kings County 1993]) this does not mean that the Bialostok rule is one of Federal constitutional law; especially in light of Federal decisions to the contrary. Analysis of Bialostok from the perspective of People v Sprowal (supra) makes this clear. In Sprowal the Court of Appeals, continuing its analysis of the retroactivity of People v Antommarchi (80 NY2d 247 [1992]), which it began in People v Mitchell (supra), explained that while the right to be present may be "rooted in [Federal] due process concerns,” the source of the right to be present at sidebar conferences was statutorily located. (84 NY2d, at 118, supra.)
So too with the distinction between the Federal constitutional requirement of a warrant for installation of an eavesdropping device and the lack of any such requirement for a pen register. Indeed, in Smith v Maryland (442 US 735 [1979]), the Supreme Court held that the use of a pen register was not a search within the meaning of the Fourth Amendment. And since the dissenting opinion in the Maryland Supreme Court pointed out that the pen register was "subject to abuse because it may be easily converted into a wiretap by attaching headphones or a tape recorder to appropriate terminals on the pen register unit” (Smith v State, 283 Md 156, 185, 389 A2d 858, 874, n 4 [1978] [Cole, J., dissenting]), Smith can hardly be read as a case involving a pen register without the additional capacity to monitor conversations. Analytically, then, since Smith dealt with precisely the same type of device as did Bialostok (supra), it is evident that the underpinning of the decision in Bialostok is our State statute; not a Federal constitutional right.
Before turning then to an application of the Pepper-Mitchell tripartite test, the next question is whether Bialostok estab *415 lished a new rule of law. It certainly did. Previously, in People v Guerra (65 NY2d 60 [1985]), the Court of Appeals held that the warrantless installation of a pen register, of the same type in Bialostok[3] did not violate the defendant’s Federal constitutional rights. In 1988, New York enacted CPL article 705 ("Pen Registers and Trap and Trace Devices” [L 1988, ch 744]), which created a "modified form of statutory protection” for pen registers. (Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL art 700, at 560.) Bialostok, however, did not deal with that statute; rather it placed pen registers with audio capacity under article 700, which requires a warrant, holding that "installation of them without one [is] unlawful.” (80 NY2d, supra, at 745.) This "judicial holding, overruling established precedent” (People v Favor, 82 NY2d, supra, at 263), is a new rule of law which requires application of the Pepper-Mitchell factors. It is not, as pointed out in Favor, quoting from an earlier case, " '[a] judicial decision construing the words of a statute [for the first time] [which] does not constitute the creation of a new legal principle’ ”, nor is it the "mere application of existing principles to a new set of facts.” (People v Favor, supra, 82 NY2d, at 263-264.) Rather Bialostok constitutes a new rule, which certainly "broke * * * new legal ground.” (Supra, at 264.)
Having concluded that Bialostok (supra) broke new legal ground, a consideration of the three Pepper-Mitchell factors leads me to conclude that the Bialostok rule should be applied only prospectively.
First, the purpose of the rule is unrelated to the fact-finding process; in other words it does not "go to the heart of a reliable determination of guilt or innocence.” (People v Pepper, supra, 53 NY2d, at 221.) Instead, it relates to the exclusion of evidence for failure to comply with the construed statutory requirement to obtain a warrant, when a pen register "having the additional capacity to monitor conversations” is utilized. This court-imposed exclusionary rule for a statutory violation has no relation to the reliability of the evidence sought to be used. This being so, there would be no rational reason for retroactive application, as there has been similarly no rational reason for retroactive application of the exclusionary rule in search and seizure cases. (E.g., United States v Peltier, 422 US 531, cited approvingly in People v Pepper, supra.)
*416 Second, it is undeniable that law enforcement authorities completely relied on the old rule. Further comment is unnecessary.
Finally, since virtually every wiretap application in this State, before the Bialostok rule was announced, was generally preceded by a pen register application, or at some point in the warrant extension process, involved the use of a pen register, the retroactive application of this rule would create a substantial burden on the administration of justice. This would not be so because of the absolute number of such cases which would be affected, since quite obviously that number is not large. Rather, since such cases normally involve a huge expenditure of resources and deal with extremely serious ongoing criminal activity, retroactive application would wreak "havoc” on the administration of justice. (See, People v Mitchell, supra, 80 NY2d, at 528.) Dismissal of these cases would be insured, when the now improperly obtained telephone numbers cannot be excised from the finding of probable cause supporting the eavesdropping warrant. This situation is certainly unrelated to the integrity of the fact-finding process, and is one that could not have been anticipated, even if blessed with clairvoyance, by law enforcement agencies which followed the carefully drafted statutory pen register procedures.
I, therefore, decline to apply Bialostok (supra) retroactively. In light of this, defendants’ motion is denied.

. I decline the People’s invitation to limit Bialostok (supra). I do not believe that there is any doubt as to the meaning of the Court’s decision, or its subsequent decision denying the motion to recall the opinion (81 NY2d 995): a pen register with an audio function, whether disabled or unused, is the functional equivalent of an eavesdropping device, implicating the probable cause strictures of CPL 700.15.

. This conclusion is reached even though the issue of Bialostok’s retroactivity was briefed in Gilpin II (supra), since it is hardly possible that a panel of the Appellate Division would decide an issue as significant as this one without even mentioning it in its decision. And, especially, when the record of proceedings in the lower court makes it abundantly clear that it was not the subject of the proceedings following the appellate remand and there was no nisi prius finding, explicit or otherwise, on this issue.

. See page 13 of the People’s supplemental brief in Gilpin II (supra).